**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DOUGLAS DEPODESTA,<br><br>*Plaintiff*,<br><br>v.<br><br>ANDREW BOUTROS in his official capacity as the United States Attorney for the Northern District of Illinois;<br><br>KASHYAP P. PATEL in his official capacity as Director of the Federal Bureau of Investigation;<br><br>FEDERAL BUREAU OF INVESTIGATION;<br><br>TODD BLANCHE in his official capacity as Attorney General of the United States;<br><br>U.S. DEPARTMENT OF JUSTICE;<br><br>ANDREW BOUTROS in his personal capacity;<br>*Defendants*. | ) | Case No. ____________________<br><br>Judge ____________________<br><br>**JURY TRIAL DEMANDED** |

**<u>COMPLAINT</u>**

**<u>INTRODUCTION</u>**

1. Douglas DePodesta ("DePodesta") spent over twenty-four years serving the people of the United States as a Federal Bureau of Investigation ("FBI") Special Agent. From 2024 until his forced resignation in 2026, he led the FBI's Chicago Field Office with distinction. DePodesta led the office in its mission to enforce the criminal laws of the United States without fear or prejudice and without regard to politics.

2. Beginning in September 2025, the Department of Homeland Security ("DHS") began what it touted as an immigration enforcement action dubbed "Midway Blitz." This

operation was met with protests throughout the Chicagoland area. President Donald Trump and other officials in Washington, D.C., called for the arrest of these protesters. Defendant Andrew Boutros, the United States Attorney for the Northern District of Illinois, in response to this call by politicians from Washington, sought and obtained criminal charges against a series of protesters. The highest profile of those cases was known as the "Broadview Six" case, prosecuted in *United States v. Michael Rabbitt, et al.,* No. 1:25-cr-00693 (N.D. Ill.).

3. These politically motivated prosecutions were an unprecedented disaster for the United States Attorney's Office ("USAO") for the Northern District of Illinois. The Broadview Six case in particular disintegrated because of improprieties by federal prosecutors, including Boutros himself, before the grand jury and in related proceedings before the United States District Court for the Northern District of Illinois. Solely because of the improper conduct of prosecutors, including himself, Boutros chose to dismiss all charges in the Broadview Six case.

4. The dismissal of the Broadview Six case brought extraordinary adverse publicity to the USAO for the Northern District of Illinois. It was also a public humiliation to Defendant Boutros. In addition to a torrent of negative media coverage, both Illinois United States Senators called on Defendant Boutros to resign.

5. To deflect attention from his own malfeasance, Boutros began a campaign within the Department of Justice to blame DePodesta for the unraveling of the case. Despite knowing that the case was dismissed because of improprieties by those under Boutros' supervision, and Boutros himself, before the grand jury and the district court, and despite knowing that DePodesta had nothing to do with those grand jury or court proceedings,

Boutros repeatedly complained to his superiors in Washington that DePodesta was responsible for the disintegration of the Broadview Six case.

6. Boutros made these false and defamatory statements knowing they were untrue and intending them to harm DePodesta professionally.

7. Eventually, Boutros' complaints had their intended effect. DePodesta's superiors at the FBI told DePodesta that the political pressure Boutros created was irresistible, and they ordered DePodesta to resign from the FBI.

8. Faced with no realistic alternative, DePodesta was forced to resign from the FBI as a direct result of Boutros' defamation.

9. This action is brought to redress the harm done to DePodesta's otherwise spotless reputation and other damages he suffered as a result of Boutros' false statements and the actions of government officials who knowingly participated in DePodesta's forced resignation.

**PARTIES**

10. Douglas DePodesta is a resident of Cook County. At all times relevant to this Complaint, until Defendants' unlawful conduct, DePodesta had spent his entire career in public service as a law enforcement officer and agent. DePodesta was a Senior Executive employee. From 2024 until his forced resignation as a result of Defendants' misconduct, DePodesta served as the Special Agent In Charge ("SAC") of the FBI's Chicago Field Office, in which role he served as the senior manager and top field leader of the office.

11. Defendant Andrew Boutros is the United States Attorney for the Northern District of Illinois who was appointed by the district court "until the vacancy is filled." 28 U.S.C. § 546(d). Boutros maintains an office in the Northern District of Illinois. On information and

belief, Defendant Boutros is a resident of the Northern District of Illinois. Boutros initiated and caused the unlawful and unconstitutional actions taken against DePodesta.

12. Defendant Kashyap Patel is the Director of the FBI, who was nominated by President Donald Trump in 2024 and has served in the role since 2025. Patel maintains an office in Washington, D.C. On information and belief, Patel authorized and ordered the unlawful and unconstitutional actions taken against DePodesta.

13. Defendant Todd Blanche is the United States Attorney General, leading the United States Department of Justice, who was appointed as Acting Attorney General by President Trump in April 2026 and was confirmed by the U.S. Senate in June 2026.

14. Defendant United States Department of Justice ("DOJ") is a federal agency with headquarters in Washington, D.C. DOJ operates nationwide, with U.S. Attorneys leading regional field offices ("USAOs") in each judicial district.

15. Defendant Federal Bureau of Investigation is a federal agency and subordinate component of Defendant United States Department of Justice. The FBI maintains headquarters in Washington, D.C., and operates nationwide, including in its Chicago Field Office.

**JURISDICTION AND VENUE**

16. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 (judicial review of agency actions and waiver of sovereign immunity).

17. The Court has supplemental subject matter jurisdiction over Plaintiff's state law tort claim pursuant to 28 U.S.C. § 1367, because that claim arises out of the same common nucleus of operative facts as those giving rise to constitutional and federal statutory claims.

18. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), 28 U.S.C. § 1391(e)(1), and 5 U.S.C. § 703.

## FACTUAL ALLEGATIONS

### Operation Midway Blitz

19. Operation Midway Blitz was foreshadowed on September 6, 2025, when President Trump posted on social media a photograph of the Chicago skyline in flames and military helicopters, under the title of "Chipocalypse Now." The post said "Chicago about to find out why it's called the Department of WAR." DHS announced the launch of Operation Midway Blitz later that week.

20. Greg Bovino, a Border Patrol Officer, was the Commander of Operation Midway Blitz and had command of some FBI, Drug Enforcement Administration ("DEA"), Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and Immigration and Customs Enforcement ("ICE") agents in relation to Midway Blitz.

21. Throughout Midway Blitz, citizens in the Chicago area protested the aggressive actions taken by federal immigration agents. At times, the federal immigration agents clashed with protesters, media covering the protests, and religious practitioners present at the scenes.

22. The cause of those clashes became a source of controversy that played out in the media, including social media, and the courts. Greg Bovino and other federal immigration agents claimed their actions toward protesters, the press, and others were "more than exemplary." The video evidence showed they were not.

23. President Trump and other Washington officials called for the arrest of protesters for claimed interference with federal immigration agents, notwithstanding the truth as often established by video evidence. The ill-fated Midway Blitz prosecutions followed these calls.

**The Typical Process For Charging Defendants**

24. The United States Attorney's Office initiates federal prosecutions in court. There are two options to initiate a felony prosecution. First, the United States Attorney's Office can file with the court a Complaint alleging that there is probable cause to believe a defendant has violated federal criminal laws. That Complaint is accompanied by an affidavit, typically from a law enforcement officer, describing the factual basis for the conclusion that there is probable cause to believe that a crime was committed and the defendant committed that crime. The Complaint is presented to a United States Magistrate Judge for her review and she determines whether the affidavit meets the probable cause standard. No defense attorney or defendant participates in this process.

25. If a Complaint is signed by a United States Magistrate Judge, an arrest warrant is issued and, upon a defendant's arrest, the United States Attorney's Office has 30 days to seek an indictment from a grand jury or ask for an extension.

26. Typically, unless there is an imminent danger to public safety, e.g., a violent bank robber is at large, a preliminary investigation that gathers objective evidence such as video or audio recordings and witness accounts is conducted before a Complaint is filed. In part because no defendant or defense attorney participates in this stage of the criminal justice process, the USAO performs a meaningful role in evaluating whether probable cause exists.

27. It is rare that a Complaint filed by the USAO is later dismissed on its merits. The Complaint typically is followed by an indictment issued by the grand jury.

28. Historically, it was extremely rare that a grand jury rejected charges proposed by the USAO. The USAO conducts the grand jury proceedings. No defendant or defense attorney participates in the process. The standard of proof for a grand jury is probable cause. That is, the grand jury considers whether there is probable cause to believe the crime that the

USAO proposes in the indictment was committed and that the defendant committed the crime. Probable cause is among the lowest standards of proof in the justice system. At trial, the USAO would have to prove the defendant guilty beyond a reasonable doubt.

29. Typically, the USAO does not seek charges in a grand jury unless it believes that it can prove the defendant guilty beyond a reasonable doubt at trial. The USAO understands that the mere charge of a federal crime has a profound and sometimes life-altering effect on the defendant charged.

**The Midway Blitz Prosecutions Dramatically Deviate From the Norm**

30. In response to the calls from Washington, D.C., Defendant Boutros instructed people in his office to charge protesters with crimes. Many of these cases were not investigated by the FBI; some were.

31. In a number of instances, Defendant Boutros was met with resistance from Assistant United States Attorneys ("AUSAs") who believed probable cause did not exist to charge protesters with crimes. In response, Defendant Boutros instructed the AUSAs to move the cases forward, despite their misgivings.

32. The FBI was involved in investigating some cases involving protesters.

33. For a substantial part of Midway Blitz, then-Special Agent In Charge DePodesta was detailed to FBI headquarters in Washington, D.C., as one of four Operational Directors of the Bureau.

34. Throughout Midway Blitz, DePodesta and Defendant Boutros had disagreements about whether particular protesters should be charged with assault of federal officers and whether the FBI would open investigations into politically motivated charges.

35. On one occasion, for example, Defendant Boutros sent DePodesta a video of a federal immigration agent having a physical confrontation with a protester. Boutros pressed

DePodesta to have an FBI agent write an affidavit saying that the interaction captured in the video was an assault on a federal officer. Both DePodesta and the FBI agent believed that the video did not show an assault on a federal agent, but rather incidental touching as a result of the federal immigration agent's tackling of the protester. DePodesta refused to instruct an FBI agent to draft a sworn affidavit attesting to something he did not believe was true. Boutros was openly hostile in response to DePodesta's refusal.

36. On other occasions, Boutros sent DePodesta emails demanding that DePodesta open FBI investigations into individuals with political views or affiliations in opposition to the Trump administration. On each occasion, DePodesta asked for factual predication that would justify opening an investigation, in accordance with DOJ regulations and DePodesta's ethical and professional obligations. When Boutros could not provide adequate predication, DePodesta declined to open investigations. On each occasion, DePodesta's refusal to open politically motivated investigations without predication was met with hostility from Defendant Boutros.

37. These prosecutions of protesters were being launched against the backdrop of a federal judge holding hearings regarding the conduct of federal immigration agents during their encounters with protesters. In proceedings related to a lawsuit brought by news media and individual protesters against federal immigration agents and federal agencies to protect their constitutional First Amendment rights, a federal judge in this District reviewed video evidence of several encounters and found that the objective evidence belied the agents' claim that protesters initiated physical conflict.[1] In fact, in one instance, agents lobbed flashbang

---

[1] *See Chicago Headline Club, et al. v. Noem, et al.*, Case No. 25-CV-12173, Transcripts of Proceedings held on November 5 and November 6, 2025 before the Honorable Sara Ellis, ECF Nos. 255-56. https://www.nytimes.com/2025/11/06/us/sara-ellis-gregory-bovino-tear-gas-illinois.html

grenades, pepper balls, and tear gas at protesters without warning or provocation. In another instance, an agent drove erratically and brake-checked other motorists in an attempt to force accidents that agents could then use as justifications for deploying force.

38. After conducting hearings and carefully evaluating the objective evidence, the court related instance after instance where federal immigration agents alleged one thing and the objective evidence showed they were lying or mistaken so that "at some point, it becomes difficult, if not impossible, to believe almost anything" they represent.[2]

39. In light of these highly public proceedings and court findings, Defendant Boutros had reason to doubt the version of events provided to his office by the federal immigration agents involved in Midway Blitz. Nonetheless, he pressured members of his office to charge cases based on the representation of these agents before investigating the objective evidence, e.g., bodycam footage of the relevant incidents. In other cases, Defendant Boutros urged felony charges when his AUSAs favored misdemeanors or no charges at all.

40. Officials in Washington, D.C., pressured Boutros to bring felony charges against protesters, and Boutros in turn pressured his AUSAs to bring insufficiently supported or inflated charges.

41. In total, approximately 33 defendants were charged with federal crimes relating to protests during Midway Blitz. At least three of these cases were submitted to the grand jury for indictment and the grand jury refused to bring charges. Twenty of these cases were dismissed outright by the USAO. Another six of these cases were the subject of a deferred prosecution agreement. Two of those six have been dismissed already, and the other four anticipate that the charges will be dismissed after some period of time. One of the cases was

---

[2] *See Chicago Headline Club, et al. v. Noem, et al.*, Case No. 25-CV-12173, November 21, 2025 Opinion and Order, ECF No. 281.

tried before a jury and the jury acquitted the defendant. The defendant pled guilty in two of these 33 cases, and one case is still pending.[3]

42. Only approximately 6% of the Midway Blitz cases brought against protesters by Defendant Boutros' office resulted in a finding of guilt. That is an unprecedented failure rate for the USAO in the Northern District of Illinois.

**The Broadview Six Case**

43. The most spectacular failure of the USAO and the case that caused the most adverse publicity to the USAO and Defendant Boutros was brought against six protesters: Brian Straw, Kat Abughazaleh, Andre Martin, Michael Rabbitt, Catherine Sharp, and Joselyn Walsh. These individuals were prosecuted in *United States v. Michael Rabbitt, et al.,* No. 1:25-cr-00693 (N.D. Ill.), which became known as the Broadview Six case.

44. On September 26, 2025, a protest was held outside the Broadview, IL detention center in the western suburbs of Chicago. During that protest, a federal agent drove his car through the crowd.

45. Several elected officials and candidates for elected office were among the protesters. The protest and the agents' conduct were the subject of considerable news media coverage and social media content. Persons close to the Trump administration called for criminal prosecution of the protesters, particularly Kat Abughazaleh, who was running for the office of United States Representative at the time.

46. Defendant Boutros has made public statements that his office did not seek charges against people based on political considerations. Defendant Boutros caused his Assistant

[3] https://chicago.suntimes.com/2026/tracker-federal-prosecutions-chicago-status-trumps-immigration-blitz-ice (accessed on November 1, 2026).

United States Attorneys to assert that there had been no communications between himself and Main Justice about any investigatory or charging decisions in the Broadview Six case.

47. In fact, the USAO recently revealed that on September 27, 2025, the day after the agent drove his car through the crowd of protesters, Defendant Boutros met with attorneys from Main Justice and others regarding the case. Special Agent In Charge DePodesta and other FBI officials were present at this meeting.

48. Additionally, on October 7, 2025, Defendant Boutros, Defendant Blanche, Defendant Patel, Assistant Attorney General Colin McDonald, and Special Agent In Charge DePodesta met in person in DePodesta's office located at 2111 West Roosevelt Road, Chicago, IL 60608. During this meeting, Defendant Boutros discussed the Broadview Six investigation with his superiors in the Department of Justice and other law enforcement officers.

49. On information and belief, these were not the only communications Defendant Boutros had with Washington about bringing charges against public figures who were protesting while the agent drove his SUV through the crowd and about the progress of those cases.

50. In response to this pressure, Defendant Boutros instructed his AUSAs to seek charges against public figures who were protesting on September 26, 2025, overruling objections that the case was better suited to misdemeanor charges, according to an AUSA who was directed to pursue the charges.

51. DePodesta had no role in deciding to seek charges against the Broadview Six.

52. The proposed indictment of the Broadview Six was first presented to the grand jury on October 9, 2025, two days after Defendant Boutros' meeting with his superiors in DOJ and other law enforcement officers from Washington.

53. AUSAs typically introduce a case by describing what they expect the evidence to show and the proposed charges for the grand jury to consider. Sworn testimony and/or exhibits are presented to the grand jury for the grand jury's evaluation of the evidence. In part because there is no judge and no defense attorney present, AUSAs are trained to be extremely cautious to avoid injecting any impropriety into the process.

54. Due to that historic caution, AUSAs have historically been afforded a presumption – known as the "presumption of regularity" – that they have behaved properly before the grand jury.

55. On October 9, 2025, two AUSAs presented the case to the grand jury. The proposed charges were conspiracy to obstruct a federal law enforcement officer – a felony that carried a potential sentence of five years in prison, and assault of a federal officer – a misdemeanor that carried a potential sentence of one year in prison.

56. An FBI agent testified and the grand jury was shown video evidence of the incident in question. After deliberation, the grand jury issued a no bill; that is, they rejected the proposed indictment in full. No bills are extremely rare.

57. One potential course of action for the USAO after a no bill is to accept the grand jury's judgment and not proceed further with the case. On information and belief, Defendant Boutros was well aware that course of action would not have pleased his superiors in Main Justice and the current administration. Defendant Boutros instructed his AUSAs to return to

the grand jury and persuade the grand jurors to return the proposed indictment of the Broadview Six.

58. On October 16, 2025, the AUSAs returned to the grand jury to follow Defendant Boutros' instructions. (A grand jury typically meets once a week on the same day each week.) The AUSAs asserted that they were returning to the grand jury to better explain the law. Some grand jurors who had already heard the FBI agent's testimony and seen the video evidence expressed skepticism, or worse, about the proposed charges. One AUSA asked the grand jurors if they had an open mind, despite the fact that the grand jury had already seen video evidence of the incident, heard the FBI agent's testimony, heard the law from the AUSAs, and reviewed and rejected the proposed charges. Multiple grand jurors expressed that they viewed that evidence as not supporting the proposed charges, but they were dismissed by the AUSAs. The grand jury was not asked to return an indictment on that day.

59. On October 23, 2025, at Defendant Boutros' instructions, the AUSAs appeared a third time before the grand jury. But before they did, Defendant Boutros took the extraordinary step of personally addressing the grand jury to admonish them about any biases they might have in "immigration" cases and urging them to disqualify themselves if they felt they were biased.

60. It is rare, and perhaps unprecedented, for the United States Attorney to appear before a grand jury to explore potential biases after that grand jury has sat for a period of time. On information and belief, no United States Attorney has ever gone before a grand jury to explore potential biases about a certain category of cases after the grand jury had returned a no bill in such a case. Defendant Boutros wrongly used the weight of his office to

influence the grand jury and to make them believe there was something improper about forming a view of the case after reviewing the key evidence in the case and hearing the law.

61. Defendant Boutros' appearance before the grand jury had its desired effect. On October 23, 2025, the grand jury returned a true bill for the exact same indictment they had rejected two weeks before.

62. Special Agent In Charge DePodesta was not involved in the grand jury proceedings and did not know any details about what was happening in the proceedings. He had no knowledge about the improprieties before the grand jury until Defendant Boutros informed him of the issues with the grand jury on May 20, 2026.

63. Concerned that the government had not correctly instructed the grand jury on the law, the defense attorneys in the Broadview Six case sought the transcripts of the grand jury proceedings described above. On information and belief, at Defendant Boutros' direction, his office vigorously resisted turning over those transcripts, thus attempting to conceal from the district court and the public what had transpired before the grand jury, including Defendant Boutros' direct role.

64. After repeated requests for the grand jury transcripts went unanswered, in April 2026, the Broadview Six defendants moved to have the government produce for the court's review the grand jury transcripts where the AUSAs described the law to the grand jurors. The government did not oppose that motion. Instead of producing the entire transcripts in question, however, the government heavily redacted the transcripts even though those transcripts were only going to be reviewed by the Judge. Nor was Defendant Boutros' role in appearing before the grand jury revealed to the court.

65. The court noted that there were substantial redactions in the transcripts given to the Judge by the USAO. The court ordered the government to produce the unredacted transcripts for its review.

66. Days later, on April 29, 2026, at Defendant Boutros' direction, the government informed the court that it would dismiss the conspiracy charge against the defendants – the only felony charge – but would continue to prosecute those defendants for misdemeanor assault. Rather than letting the existing indictment with the misdemeanor charges stand, the government filed a superseding information with the exact same misdemeanor charges. The grand jury is only required to consider indictments for felonies. The government can, on its own authority, issue misdemeanor charges. Thus, by dismissing the only felony charge, Defendant Boutros sought to conceal forever his own and his office's improprieties before the grand jury – including Boutros' unprecedented direct address to the grand jury. Defendant Boutros' office argued, and the court agreed, that any impropriety before the grand jury was mooted by the dismissal of the felony count.

67. The Broadview Six defendants disagreed and moved the court to require the government to produce the unredacted transcripts. The defendants argued that the presumption of regularity that the USAO had enjoyed because of years of performing its duties with integrity had been destroyed by Defendant Boutros and the acts of his AUSAs at his direction. At the pretrial conference, the government did not object to the unredacted transcripts being produced to the court – nor could they have credibly done so. The unredacted transcripts were produced to the court on May 19, 2026. The court then scheduled a hearing, ordering that anyone at the USAO who had anything to do with the redaction of the transcripts appear at a hearing before the court on May 21, 2026.

68. On May 20, 2026, SAC DePodesta was at the USAO for an unrelated meeting. Defendant Boutros pulled DePodesta aside to notify him about the issues related to the grand jury proceedings and the court's orders on the matter. Immediately after this conversation, DePodesta attended a meeting with the trial team. Later that day, DePodesta called his Operational Director and notified him about the U.S. Attorney's Office's malfeasance in the Broadview Six matter.

69. On May 21, 2026, the court held a hearing that was initially under seal because it involved grand jury material. The government came to that hearing fully intending to proceed to trial a week later against the remaining defendants in the Broadview Six case on the misdemeanor charges. During the morning session of that hearing, the court described the misconduct that the transcripts revealed, noting that it had "never seen [these] types of prosecutorial behavior before a grand jury." (At this time, the government still had not revealed Defendant Boutros' direct role before the grand jury.) The court indicated, however, that it was more troubled by the redactions of the transcripts. The court said that it was "incredibly shocked by the redactions that were made" and that the redactions were "the most problematic." The court commented "I treat every attorney who appears before me as an officer of the court… I put even more reliance on Department of Justice attorneys… That trust has been broken." The court found the attempt to conceal the improprieties from the court most troubling.

70. On information and belief, Defendant Boutros either directed the redactions to be made, approved the redactions, or was willfully ignorant of the redactions that were made.

71. The court indicated that it previously had denied the Broadview Six defendants' motion to compel discovery, which the defendants intended to use in support of a future

motion for vindictive prosecution, because the court had relied on the government's express representations to the court and had presumed the USAO had acted in good faith and had not been influenced by outside political or other considerations. The court found that the presumption of regularity no longer applied in light of the now revealed government misconduct and that the issue of vindictive prosecution could be briefed. The court raised the potential for an evidentiary hearing.

72. Defendant Boutros knew that if this issue were further explored in open court, his conversations with his superiors and others from Washington about this case would be discovered. The court paused the hearing to allow the government to consult with Defendant Boutros and other supervisors from the USAO as to their position regarding whether the proceedings before the court should be unsealed.

73. When the hearing resumed that afternoon, Defendant Boutros appeared before the court. Defendant Boutros first informed the court that he was there to dismiss the remaining charges against the defendants with prejudice. This was a last-ditch attempt to end the proceedings before Defendant Boutros' role would be fully explored.

74. Indeed, Defendant Boutros spent most of his energy before the court minimizing his own involvement in and knowledge of the misconduct despite the court never inquiring about the state of his personal knowledge and despite the fact that his personal knowledge had nothing to do with what was transpiring before the court that day. It was clear that Defendant Boutros was concerned with the case's potential impact on his public image and career.

75. Defendant Boutros repeatedly told the court that he did not know of the vouching before the grand jury until April 27 or 28, 2026, and that when he learned about it, he was

very upset and immediately ordered the felony charge dismissed. He told the court: "I was completely unaware of any vouching that took place in the grand jury, and only became aware of it on either April 27 or the 28th. And immediately when I learned about the vouching, the next day I moved to dismiss the indictment. That was the first time any issue of vouching rose to my level. And, frankly, to the level of anyone in the front office." Those statements were intentionally false.

76. Typically, in grand jury proceedings, only witness testimony is transcribed – not comments from the prosecutor. The grand jury transcripts are provided to the AUSA who appeared before the grand jury in due course. That is not what happened here. Unusually, Defendant Boutros himself ordered, or directed to be ordered, the entire grand jury transcript of the full proceeding on October 9, 2025.

77. On information and belief, Defendant Boutros took the unusual step of ordering the entire grand jury transcript because he was particularly interested in the success of the Broadview Six case. Defendant Boutros received the transcript that contained the improprieties on October 14, 2025 – five days after the grand jury session took place and two days before prosecutors were authorized to return to and did in fact return to the grand jury.

78. Defendant Boutros did not reveal to the court during the May 21, 2026 hearing that he had this transcript for over six months – since just a few days after the grand jury session. Nor did Boutros reveal to the court that he personally appeared in front of the grand jury that indicted the Broadview Six, on the same day it indicted the Broadview Six.

79. In order to believe Defendant Boutros' statements to the court that he knew nothing of the improprieties before the grand jury until shortly before the court hearing, one

would have to believe that he received this transcript but did not read it, despite the following:

- Defendant Boutros took the extraordinary step of ordering the entire grand jury transcript, or directing an AUSA to order the transcript, including portions not normally transcribed – on information and belief, a United States Attorney has rarely, if ever, done so previously;

- Defendant Boutros took the extraordinary step of appearing in front of the grand jury mid-term, less than two weeks after receiving the grand jury transcript, to emphasize that grand jurors who might have a strong opinion about a certain type of case, particularly immigration cases, should disqualify themselves – on information and belief, no United States Attorney has ever done so;

- After Defendant Boutros admitted he was fully apprised of all of the improprieties that plagued this case, he still instructed his assistants to go to trial against the remaining Broadview Six defendants on misdemeanor assault charges. He was not "upset" enough to dismiss those charges until it became clear that the Judge was impacted by the government's misconduct and was going to hold hearings about vindictive prosecution, which would have involved Boutros and revealed his role in the case including his conversations with Main Justice; and

- Defendant Boutros knew that his superiors at Main Justice and others in the administration were keenly interested in the Broadview Six case.

**Defendant Boutros Initiated Special Agent In Charge DePodesta's Effective Termination**

80. Because of the events described above, Defendant Boutros and the USAO that he leads were widely criticized in myriad media outlets. On information and belief, Defendant Boutros sought a scapegoat for his own misconduct and that of his Office. Special Agent In Charge DePodesta was that scapegoat.

81. In early June 2026, days after the hearing where Defendant Boutros was forced to dismiss the Broadview Six case with prejudice, DePodesta received a call from the Deputy Director of the FBI, Christopher Raia, based in Washington. Deputy Director Raia asked DePodesta what was happening with the Broadview Six case. At that time, the Broadview Six case was squarely in the hands of the USAO and DePodesta had no role in or direct visibility into the case, beyond being kept apprised of the developments given his role as the top FBI agent in charge of the Chicago Field Office. Deputy Director Raia told DePodesta that Defendant Boutros told his superiors in the Department of Justice that DePodesta and his sister-in-law, a prominent defense attorney in Chicago who represented Michael Rabbitt, one of the Broadview Six defendants, had conspired to destroy the Broadview Six case. Deputy Director Raia said that Defendant Boutros had created a stir with his allegations against DePodesta and those allegations were communicated to FBI Director Kashyap Patel.

82. DePodesta told Deputy Director Raia that he had nothing to do with the events that led to the dismissal of the Broadview Six case. DePodesta went on to explain why Defendant Boutros' allegations were absurd. DePodesta explained that the case disintegrated primarily because of the improprieties by AUSAs during grand jury proceedings and in court. No one other than the AUSAs took part in those improprieties. The case's underlying evidentiary and factual weaknesses also contributed to its dissolution.

83. DePodesta further explained to Deputy Director Raia that he had not, and would never have, discussed the Broadview Six investigations or cases with his sister-in-law, Nancy DePodesta. DePodesta explained that both he and Nancy DePodesta were professionals who held their ethical obligations and professional integrity in the highest regard, and they would

never have breached those values by inappropriately discussing details of the Broadview Six case.

84. Deputy Director Raia agreed that Defendant Boutros' allegations could not be true. He agreed with DePodesta's assessment that the Broadview Six prosecutions had fallen apart due to the USAO's misconduct before the grand jury and in court, as well as the underlying issues with the factual basis for the prosecutions. He also stated that he knew DePodesta to be a professional of the utmost integrity.

85. DePodesta then called the FBI Associate Deputy Director, B. Chad Yarbrough, to inform him about what was going on. Yarbrough, like Raia, assured DePodesta that he understood DePodesta did nothing wrong and that he understood Defendant Boutros' statements were not true.

86. Approximately one month later, at the beginning of July, Associate Deputy Director Yarbrough called DePodesta. Associate Deputy Director Yarbrough was apologetic, but he said that Defendant Boutros continued to insist that DePodesta had conspired to destroy the Broadview Six case. Yarbrough said that Boutros was repeating these claims to Defendant Blanche and Defendant Patel, among others. Associate Deputy Director Yarbrough added that Defendant Patel did not want the controversy, and Defendant Patel therefore insisted that DePodesta needed to be terminated, regardless of the truth of Boutros' allegations about DePodesta.

87. Associate Deputy Director Yarbrough told DePodesta that the termination had nothing to do with DePodesta's performance. It was solely due to Defendant Boutros' false statements and the controversy that those statements had created. Associate Deputy Director Yarbrough told DePodesta that DePodesta had to resign.

88. On information and belief, Defendant Boutros' false statements about DePodesta were motivated by a desire to shift blame for the Broadview Six fiasco to someone other than Boutros and his USAO, by retaliation for DePodesta's familial relationship with his sister-in-law Nancy DePodesta, by retaliation for Nancy DePodesta's representation of one of the Broadview Six defendants, and by retaliation for DePodesta's insistence on following the law, the Constitution, and FBI policy rather than political motives in making investigative decisions.

89. Special Agent In Charge DePodesta understood that he had no real choice in the matter. The writing was on the wall – he had to resign. DePodesta knew that if he did not resign as instructed, he would be terminated. He understood that because of Defendants' actions, specifically Defendant Boutros' false statements about him and Defendants Blanche, Patel, DOJ, and FBI's decision to terminate him without cause, he had no future at the FBI despite his years of good service and leadership. DePodesta had no choice but to follow the order to resign and submitted his resignation as ordered on July 1, 2026. His last day of employment was July 2, 2026.

90. News coverage of DePodesta's resignation largely highlighted DePodesta's years of service, success leading the Chicago Field Office, and the abrupt nature of his resignation. His resignation was also discussed broadly on social media networks.

91. On July 1, 2026, at 8:06 PM Central time, an account on the social media site "x.com" (formerly twitter.com) called FBI Rapid Response, with the handle @FBI_Response, made a post that reads: "It's simple: Anyone who is not on board with

THIS FBI under the leadership of President Trump—which has achieved the lowest murder rate ever—is free to leave."[4]


FBI Rapid Response
@FBI_Response

It's simple:

Anyone who is not on board with THIS FBI under the leadership of President Trump—which has achieved the lowest murder rate ever—is free to leave.

8:06 PM · Jul 1, 2026 · **290.5K** Views

146 540 4K 39

Relevant View quotes

92. Although FBI Rapid Response's post does not reference DePodesta by name, it was posted as a reply to another x.com post announcing DePodesta's resignation,[5] making it clear to any reader that the FBI Rapid Response post is about DePodesta as well.

93. FBI Rapid Response is a "verified account" with a gray checkmark, meaning it is an official government account, and it is designated as a verified affiliate of the FBI's official x.com account, @FBI. This means that an x.com employee manually verified that the

[4] https://x.com/FBI_Response/status/2072487049723064668 (accessed on October 1, 2026).
[5] *Id.*

account genuinely belongs to the FBI. Further, FBI Rapid Response's account page identifies itself as "The OFFICIAL Rapid Response for @FBI."[6]




94. On July 6, 2026, Deputy Director Raia sent DePodesta a text message apologizing for "the way things went down" and thanking DePodesta for his years of leadership and hard work.




95. At all times relevant to this Complaint, everyone involved in deciding to force SAC DePodesta to resign either knew that the purported reason for terminating DePodesta's employment was false or was willfully or negligently ignorant about the truth of the purported reason. DePodesta's immediate superiors, Deputy Director Raia and Associate Deputy Director Yarbrough, knew him to be a competent, ethical, and hardworking

---

[6] https://x.com/FBI_Response (accessed on October 1, 2026).

professional of great integrity and understood that he had not caused the disintegration of the Broadview Six case.

96. Defendant Boutros knew that SAC DePodesta had nothing to do with the disintegration of the Broadview Six case. Defendant Boutros knew that the Broadview Six case had to be dismissed because of his own malfeasance and the misfeasance of his AUSAs at his direction. Defendant Boutros wanted to deflect attention from his own failings and the failings of his office to avoid negative scrutiny from his superiors in Washington and the media. He decided to deflect attention by falsely pointing the finger at DePodesta. Boutros understood his statements were false, he intentionally made those statements to force DePodesta out, and his false statements had their intended effect. In a vain attempt to salvage his own reputation, Defendant Boutros pressured and convinced Defendants Patel, FBI, Blanche, and DOJ to sacrifice an outstanding public servant.

## CAUSES OF ACTION

### COUNT I
### Violation of the Fifth Amendment
### Deprivation of a Property Interest without Due Process of Law
### (Against Defendants Patel, FBI, Blanche, and DOJ)

97. DePodesta repeats and realleges Paragraphs 1-96 as if fully restated herein.

98. The Due Process Clause of the Fifth Amendment guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law." DePodesta has a protected property interest under the Due Process Clause in his continued employment with the FBI under the Fifth Amendment of the United States Constitution.

99. DePodesta was not an at-will employee, and his employment and termination were governed by federal statute. Specifically, DePodesta's employment and termination

were governed by the FBI and DEA Senior Executive Service Act, Pub. L. No. 100-325, 102 Stat. 579 (5 U.S.C. § 3151) ("FBI SES Act").

100. The FBI SES Act expressly limits the reasons for which FBI Senior Executive employees may be terminated and grants FBI Senior Executive employees, like DePodesta, certain pretermination rights. Incorporating by reference the requirements of 5 U.S.C. § 7543, the FBI SES Act allows removal only for "misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function." The FBI SES Act further incorporates 5 U.S.C. § 7543's pretermination requirements, which include: 30 days' advance written notice, a reasonable time (at least seven days) to respond, the right to representation, and a written decision including specific reasons for the decision.

101. DePodesta was deprived of his property interest in his ongoing employment with the FBI when he was forced to resign from the FBI under the threat of imminent termination. DePodesta was ordered to resign; he was constructively discharged.

102. DePodesta understood that disobeying this order would have been interpreted as grounds for termination. If terminated, he faced the loss of valuable retirement benefits including health insurance for himself and his family; his resignation was ordered and coerced and is equivalent to being fired.

103. DePodesta's removal from his post was not for any of the permitted reasons laid out in the FBI SES Act. Rather, it was a retaliatory action taken against him despite his years of exemplary service.

104. DePodesta's removal was effectuated without the due process of law in violation of the Fifth Amendment.

105. As a result of this violation of DePodesta's constitutional right to due process, he has suffered loss of employment, loss of income, jeopardized present and future opportunities in law enforcement, reputational harm, and mental and emotional anguish.

**COUNT II**
**Violation of the Fifth Amendment**
**Deprivation of a Liberty Interest without Due Process of Law (Stigma Plus)**
**(Against Defendants Patel, FBI, Blanche, DOJ, and Boutros in his Official Capacity)**

106. DePodesta repeats and realleges Paragraphs 1-96 as if fully restated herein.

107. The Due Process Clause of the Fifth Amendment guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law." DePodesta has a protected liberty interest under the Due Process Clause in his good name and reputation under the Fifth Amendment of the United States Constitution.

108. Defendants stigmatized DePodesta by both word and action when they spread false rumors that he had sabotaged the Broadview Six investigations, removed him from his post, and published a false and defamatory explanation of his removal on the social media site x.com after the fact.

109. Defendants publicly disclosed this stigmatic information through both the public nature of DePodesta's removal and the subsequent posting on the social media site x.com of the false and stigmatizing statement that DePodesta was "not on board with THIS FBI under the leadership of President Trump," falsely implying that DePodesta was terminated due to disloyalty to the FBI.

110. Defendants' public disclosure of stigmatizing false information about DePodesta resulted in a tangible loss of employment. DePodesta lost his role as Special Agent In Charge of the FBI's Chicago Field Office, a position of authority which he had attained after over twenty years of loyal service to the agency and which he hoped and expected to hold for

years to come. Defendants have additionally deprived DePodesta of future employment opportunities in law enforcement because the false and stigmatizing information Defendants disseminated about him has prevented him from being hired for other federal law enforcement positions or private-sector security positions of appropriate seniority and authority.

111. Since being terminated from his position in the FBI, DePodesta has unsuccessfully sought positions appropriate to his expertise and experience in the security field. Faced with unemployment, he has been forced to take a position outside of his field.

112. As a result of this violation of DePodesta's constitutional right to due process, he has suffered loss of employment, reputational harm, and mental and emotional anguish.

**COUNT III**
**Violation of the Fifth Amendment**
**Deprivation of a Liberty Interest without Due Process of Law (Intimate Association)**
**(Against Defendants Patel, FBI, Blanche, and DOJ)**

113. DePodesta repeats and realleges Paragraphs 1-96 as if fully restated herein.

114. The Due Process Clause of the Fifth Amendment guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law." DePodesta has a protected liberty interest under the Due Process Clause that protects his freedom to form and maintain intimate associations, including those among siblings and siblings-in-law.

115. DePodesta has a brother, Frank DePodesta. DePodesta grew up with his brother Frank, and they have had a lifelong close relationship. At all times relevant to the Complaint, DePodesta maintained close familial contact with his brother.

116. Since the marriage of Frank and Nancy DePodesta in 2007, and at all times relevant to the Complaint, this close familial relationship has extended to encompass Nancy DePodesta. DePodesta considers Nancy DePodesta to be a member of his family.

117. Because of his close familial relationship with his brother Frank and his sister-in-law Nancy DePodesta, Defendants forced DePodesta to resign from the FBI under the threat of imminent termination.

118. Furthermore, because DePodesta was presented with the choice between resigning and facing severe consequences including firing, the loss of valuable retirement benefits, and additional retribution, his resignation was coerced and is equivalent to being fired.

119. DePodesta's removal from his position because of his intimate association with his brother and his sister-in-law imposed a direct and substantial burden on that relationship.

120. As a result of this violation of DePodesta's Fifth Amendment right to intimate association, he has suffered loss of employment, loss of income, jeopardized present and future opportunities in law enforcement, reputational harm, and mental and emotional anguish.

**COUNT IV**
**Violation of the First Amendment**
**Freedom of Association and Freedom of Speech**
**(Against Defendants Patel, FBI, Blanche, and DOJ)**

121. DePodesta repeats and realleges Paragraphs 1-96 as if fully restated herein.

122. The First Amendment of the United States Constitution protects the freedom of speech and freedom of association.

123. Defendants violated DePodesta's First Amendment rights by removing him from his position because of his association with his brother and sister-in-law.

124. Defendants further violated DePodesta's First Amendment rights by removing him in retaliation for his sister-in-law's protected speech related to her defense of Broadview Six defendant Michael Rabbitt and in retaliation for DePodesta's perceived political affiliation and beliefs.

125. Special Agent In Charge is a career, nonpartisan civil service role, not a policymaking position, and political loyalty is not a job requirement for the role.

126. As a result of this violation of DePodesta's constitutional rights to freedom of speech and freedom of association as protected by the First Amendment, he has suffered loss of employment, loss of income, jeopardized present and future financial opportunities, reputational harm, and mental and emotional anguish.

**COUNT V**
**Violation of the Administrative Procedure Act**
5 U.S.C. §§ 706(1) and 706(2)
**(Against Defendants Patel, FBI, Blanche, and DOJ)**

127. DePodesta repeats and realleges Paragraphs 1-96 as if fully restated herein.

128. DePodesta was not an at-will employee, and his employment and termination were governed by federal statute. Specifically, DePodesta's employment and termination were governed by the FBI and DEA Senior Executive Service Act, Pub. L. No. 100-325, 102 Stat. 579 (5 U.S.C. § 3151) ("FBI SES Act").

129. The FBI SES Act expressly limits the reasons for which FBI Senior Executive employees may be terminated and grants FBI Senior Executive employees, like DePodesta, certain pretermination rights. Incorporating by reference the requirements of 5 U.S.C. § 7543, the FBI SES Act allows removal only for "misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function." The FBI SES Act further incorporates 5 U.S.C. § 7543's pretermination requirements, which include: 30 days' advance written notice, a reasonable time (at least seven days) to respond, the right to representation, and a written decision including specific reasons for the decision.

130. Most FBI employees, including DePodesta, are explicitly excluded from the Merit Systems Protection Board. 5 U.S.C. § 7511(b)(8). But Congress did not intend to deprive FBI SES employees of an avenue to appeal adverse employment decisions. On the contrary, through the FBI SES Act, Congress instructed the Attorney General to establish procedures to hold hearings or appeals for FBI SES employees who are terminated. 5 U.S.C. § 3151(a)(5)(D). The Attorney General has not done so.

131. DePodesta was not offered a means to appeal the decision to terminate him through constructive discharge and/or coerced resignation. Nor was DePodesta given adequate notice or an opportunity to meaningfully respond. Instead, he was instructed to resign immediately or face severe consequences, including the loss of valuable retirement benefits DePodesta had earned through his years of service to the FBI, further reputational harm, and retaliation.

132. DePodesta's sudden termination without access to a hearing or appeal, adequate notice, or an opportunity to meaningfully respond constituted a final agency decision that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," "without observance of procedure required by law," "unsupported by substantial evidence," and/or "unwarranted by the facts." 5 U.S.C. § 706.

133. As a result of DePodesta's unlawful termination in violation of the Administrative Procedure Act, DePodesta has suffered loss of employment, loss of income, jeopardized present and future opportunities for employment in law enforcement, reputational harm, and mental and emotional anguish.

**COUNT VI**
***Ultra Vires* Action in Violation of the FBI and DEA Senior Executive Service Act**
5 U.S.C. § 3151
**(Against Defendants Patel, FBI, Blanche, and DOJ)**

134. DePodesta repeats and realleges Paragraphs 1-96 as if fully restated herein.

135. DePodesta was not an at-will employee, and his employment and termination were governed by federal statute. Specifically, DePodesta's employment and termination were governed by the FBI and DEA Senior Executive Service Act, Pub. L. No. 100-325, 102 Stat. 579 (5 U.S.C. § 3151) ("FBI SES Act").

136. The FBI SES Act expressly limits the reasons for which FBI Senior Executive employees may be terminated and grants FBI Senior Executive employees, like DePodesta, certain pretermination rights. Incorporating by reference the requirements of 5 U.S.C. § 7543, the FBI SES Act allows removal only for "misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function." The FBI SES Act further incorporates 5 U.S.C. § 7543's pretermination requirements, which include: 30 days' advance written notice, a reasonable time (at least seven days) to respond, the right to representation, and a written decision including specific reasons for the decision.

137. In violation of clear statutory mandate, as laid out in the FBI SES Act, DePodesta was not given adequate notice or an opportunity to meaningfully respond before he was constructively discharged and/or coerced to resign. Instead, he was instructed to resign immediately or face severe consequences, including the loss of valuable retirement benefits DePodesta had earned through his years of service to the FBI, further reputational harm, and retaliation.

138. No alternative review scheme was available to DePodesta. Most FBI employees, including DePodesta, are explicitly excluded from the Merit Systems Protection Board. 5 U.S.C. § 7511(b)(8). But Congress did not intend to deprive FBI SES employees of an avenue to appeal adverse employment decisions. On the contrary, through the FBI SES Act, Congress instructed the Attorney General to establish procedures to hold hearings or appeals for FBI SES employees who are terminated. 5 U.S.C. § 3151(a)(5)(D). The Attorney General has not done so.

139. DePodesta's sudden termination without adequate notice or an opportunity to meaningfully respond was outside and contrary to Defendants' statutory authority and was therefore *ultra vires* and without legal force or effect.

140. As a result of Defendants' *ultra vires* termination of DePodesta, he has suffered loss of employment, loss of income, jeopardized present and future opportunities for employment in law enforcement, reputational harm, and mental and emotional anguish.

**COUNT VII**
**Violation of Illinois State Law**
**Defamation**
**(Against Defendant Boutros in his Personal Capacity)**

141. DePodesta repeats and realleges Paragraphs 1-96 as if fully restated herein.

142. Defendant Boutros made false, unprivileged statements about DePodesta to third parties, including Attorney General Todd Blanche, FBI Director Kashyap Patel, and others presently unknown in Main Justice. Specifically, Defendant Boutros told Defendant Blanche, Defendant Patel, and others unknown in Main Justice that DePodesta had intentionally interfered with or sabotaged the Broadview Six case and that he had improperly colluded with his sister-in-law Nancy DePodesta to undermine the prosecutions of the Broadview Six.

143. Defendant Boutros' statements constitute defamation per se.

144. In his capacity as U.S. Attorney for the Northern District of Illinois, Defendant Boutros has no supervisory, managerial, disciplinary, hiring, or firing authority over FBI Special Agents or any other FBI employee. Defendant Boutros' false statements to Defendants Blanche, Patel, and others were therefore wholly outside the scope of his employment. Boutros made those false statements in his personal capacity.

145. Defendant Boutros knew that the statements he made to Defendants Blanche, Patel, and others were false at the time he made them. Boutros knew that the actual reason the Broadview Six prosecutions fell apart, as described above, was due to misconduct by himself and his own assistants. Boutros further knew that DePodesta's immediate supervisors within the FBI, who had visibility into and oversight over his work, believed that DePodesta had acted professionally, properly, and competently throughout his entire tenure as Special Agent In Charge of the FBI's Chicago Field Office.

146. Defendant Boutros' false statements about DePodesta to third parties resulted in damages including loss of employment, loss of income, jeopardized present and future opportunities in law enforcement, reputational harm, and mental and emotional anguish.

**COUNT VIII**
**Violation of Illinois State Law**
**Tortious Interference with Prospective Economic Advantage**
**(Against Defendant Boutros in his Personal Capacity)**

147. DePodesta repeats and realleges Paragraphs 1-96 as if fully restated herein.

148. DePodesta was not an at-will employee, and his employment and termination were governed by federal statute. Specifically, DePodesta's employment and termination were governed by the FBI and DEA Senior Executive Service Act, Pub. L. No. 100-325, 102 Stat. 579 (5 U.S.C. § 3151) ("FBI SES Act"), which allows removal only for "misconduct,

neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function."

149. Given that DePodesta's employment could only be terminated for cause as laid out in the FBI SES Act, and given DePodesta's excellent performance record and ongoing positive feedback from his superiors, DePodesta had a reasonable expectation that his employment with the FBI would continue.

150. Defendant Boutros was aware that DePodesta was employed by the FBI and that DePodesta had a reasonable expectation that his employment would continue.

151. Defendant Boutros purposefully interfered with DePodesta's continued employment by the FBI when he made false, unprivileged statements about DePodesta to Attorney General Todd Blanche, FBI Director Kashyap Patel (directly or indirectly), and others presently unknown in Main Justice. Specifically, Defendant Boutros told Defendant Blanche, Defendant Patel, and others unknown that DePodesta had intentionally interfered with or sabotaged the Broadview Six case and that he had improperly colluded with his sister-in-law Nancy DePodesta to undermine the prosecutions of the Broadview Six. Defendant Boutros specifically requested and pressed for DePodesta to be fired.

152. As a result of Defendant Boutros' false statements and ongoing pressure to remove DePodesta from his role, DePodesta was coerced to resign and was constructively terminated.

153. In his capacity as U.S. Attorney for the Northern District of Illinois, Defendant Boutros has no supervisory, managerial, disciplinary, hiring, or firing authority over FBI Special Agents or any other FBI employee. Defendant Boutros' false statements to Defendant

Blanche were therefore wholly outside the scope of his employment. Boutros made those false statements in his personal capacity.

154. Defendant Boutros knew that the statements he made to Defendant Blanche were false at the time he made them. Boutros knew that the actual reason the Broadview Six prosecutions fell apart, as described above, was due to misconduct by himself and his own assistants. Boutros further knew that DePodesta's supervisors within the FBI, who had visibility into and oversight over his work, believed that DePodesta had acted professionally, properly, and competently throughout his entire tenure as Special Agent In Charge of the FBI's Chicago Field Office.

155. Defendant Boutros' false statements about DePodesta to a third party resulted in damages including loss of employment, loss of income, jeopardized present and future opportunities in law enforcement, reputational harm, and mental and emotional anguish.

**COUNT IX**
**Declaratory Judgment Act**
28 U.S.C. §§ 2201 and 2202
**(Against All Defendants)**

156. DePodesta repeats and realleges Paragraphs 1-96 as if fully restated herein.

157. DePodesta is entitled to declaratory relief on the basis of all claims identified. There is a substantial and ongoing controversy between DePodesta and Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that the Defendants did not have authority to remove DePodesta in violation of applicable statutes and the First and Fifth Amendments to the United States Constitution.

158. DePodesta has suffered adverse effects including loss of employment, loss of income, jeopardized present and future opportunities for employment in law enforcement, reputational harm, and mental and emotional anguish.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Douglas DePodesta respectfully requests that the Court award the following relief:

a. A declaration that Defendants violated DePodesta's First Amendment rights;

b. A declaration that Defendants violated DePodesta's Fifth Amendment rights;

c. A declaration that Defendants violated the Administrative Procedure Act in terminating DePodesta;

d. A declaration that Defendants acted *ultra vires* and outside of their statutory authority in terminating DePodesta and that the termination was therefore a legal nullity;

e. An order requiring Defendants to immediately reinstate DePodesta and enjoining Defendants from taking further adverse personnel action against him without providing appropriate procedural due process as required by the Fifth Amendment;

f. An award of backpay;

g. An award of compensatory money damages for the harms suffered by DePodesta;

h. An award of the costs of this action and reasonable attorneys' fees under the Equal Access to Justice Act or any other applicable law;

i. A grant of any other relief that the Court may deem just and proper.

Dated: November 2, 2026

Respectfully submitted,

*/s/ Ronald S. Safer*
Ronald S. Safer, ARDC #6186143
Matthew C. Crowl, ARDC #6201018
Leksa V. Pravdic, ARDC #6339531
RILEY SAFER HOLMES & CANCILA LLP
1 S. Dearborn St., Suite 2200
Chicago, Illinois 60603
(312) 471-8700
rsafer@rshc-law.com
mcrowl@rshc-law.com
lpravdic@rshc-law.com
*Attorneys for Plaintiff Douglas DePodesta*